<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **GEORGE H. WILLEKES;** : | |
| **MARK R. WILLEKES; and** : | |
| **ROBERT P. WILLEKES,** : | |
| : | **Civil Action No.: 13-7498 (ES) (MAH)** |
| **Plaintiffs,** : | |
| : | **OPINION** |
| **v.** : | |
| : | |
| **THE SERENGETI TRADING COMPANY;** : | |
| **SLOAT BROS. LTD d/b/a THE ANNEX;** : | |
| **GEORGE R. GUTHRIE; and GROUP G, LLC,** : | |
| : | |
| **Defendants.** : | |
| : | |

**SALAS, DISTRICT JUDGE**

## I.  INTRODUCTION

Presently before the Court are motions to dismiss Plaintiffs' Second Amended Complaint filed by Defendants The Serengeti Trading Company ("Serengeti"), (D.E. No. 71); Group G, LLC, and George R. Guthrie (collectively, the "Guthrie Defendants"), (D.E. No. 72); and Sloat Bros. Ltd. ("Sloat"), (D.E. No. 73).  Plaintiffs—George, Mark, and Robert Willekes—filed opposition briefing.  (D.E. Nos. 77, 78, 79).  Serengeti and Sloat filed replies.  (D.E. No. 81, 82).

The Court decides these motions without oral argument.  *See* Fed. R. Civ. P. 78(b).  For the following reasons, the Motions are GRANTED in part and DENIED in part.

## II.  BACKGROUND

### A.  Facts

Sloat entered into agreements in 2005, 2006, and 2007 to store, at its warehouse, approximately 5,500 bags of coffee beans.  (D.E. No. 66, Second Amended Complaint ("SAC") ¶

12).  In 2010, ownership of that coffee became the subject of New Jersey state court litigation between Plaintiffs and non-parties to this action, including Clemens M.B. Calis ("Calis"), European Coffee B.V. ("ECBV"), and European Coffee Inc.  (*See id.* ¶ 13; D.E. No. 71-2, Exhibits[1] to Certification of Thomas Kamvosoulis, Esq. ("Kamvosoulis Cert."), Ex. B, ECF pp. 28-29[2]).  Plaintiffs' involvement in the state court litigation was as follows: George Willekes was an individual counterclaimant/third-party plaintiff; Mark Willekes and Robert Willekes were individual intervenor-plaintiffs.  (SAC ¶ 14; Kamvosoulis Cert., Ex. B).

On November 7, 2011, the Honorable Thomas F. Weisenbeck, Assignment Judge of the Superior Court of New Jersey, Morris/Sussex Vicinage, entered an order (the "November 2011 Order") that contemplated the sale of the coffee and the deposit of the net proceeds of the sale in a trust account (the "Trust Account") maintained by the court-appointed special master, Cynthia F. Jacob, Esq. of Fisher & Phillips.  (SAC ¶ 16; Kamvosoulis Cert., Ex. D. at ECF pp. 66-70, November 7, 2011 Order ("11/7/11 Order")).[3]

In December 2011 and January 2012, the fair market value of the coffee was approximately $2.8 million.  (SAC ¶ 15).  Ownership of the coffee was transferred to Serengeti in a December 8,

---

[1]     "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of the public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."  *FTC v. Wyndham Worldwide Corp.*, 10 F. Supp. 3d 602, 609 (D.N.J. 2014) (citation and internal quotation marks omitted), *aff'd*, 799 F.3d 236 (3d Cir. 2015).  And, a court may consider documents that are not attached to the complaint but that are integral to or explicitly referred to in the complaint without converting the motion to one for summary judgment.  *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).  Here, all of the filings in the New Jersey state court proceeding regarding the ownership of the coffee are either integral to the SAC or are explicitly referred to in the SAC.  Moreover, consideration of those state court orders and filings is appropriate on a motion to dismiss because they are matters of public record.

[2]     The Court uses the ECF-generated page numbers that appear in the header of the Exhibits to the Kamvosoulis Certification to specify page numbers in those documents.

[3]     As the Court explains at length herein, Plaintiffs' allegations in paragraph 16 of the SAC—which are repeated throughout the SAC—are flatly contradicted by the language of the November 2011 Order.  The Court repeats that language *infra*, and discusses the conflict between the clear language of the Order and Plaintiffs' "interpretation" of that language.  For purposes of the facts, however, the Court merely provides a basic recitation of the Order's requirements.

2011 sale in which Serengeti wired $1.423 million to Calis's personal overseas "Rabobank" account. (*Id.* ¶¶ 17, 18).  Plaintiffs learned of the sale on January 13, 2012. (*Id.* ¶ 19).

On January 14, 2012, the Honorable Michael B. Wright, Presiding Judge of the Superior Court of New Jersey, ordered that the coffee not be transferred or moved from Sloat's warehouse, and that no binding contracts or transfer of title concerning the coffee be entered into or executed until further order of the court. (*Id.* ¶ 20).

On January 18, 2012, Judge Weisenbeck ordered that "[n]o party shall, directly or indirectly, cause a transfer of the Coffee from its present location until further Order of the Court." (*Id.* ¶ 21; D.E. No. 80-4, Certification of Thaddeus R. Maciag ("Maciag Cert."), Ex. D. at ECF pp. 17-18[4]).

On January 20, 2012, Judge Weisenbeck ordered Calis immediately to wire the $1.423 million from the "Rabobank" account "to the trust account of the Special Master, Cynthia Jacobs, Esq., of Fisher and Phillips." (Maciag Cert., Ex. D. at ECF p. 19).

On February 17, 2012, final judgment was entered in the New Jersey state court action against Calis and in favor of Plaintiffs. (SAC ¶ 22).  As of December 4, 2013, the amount due on that judgment was $4.92 million. (*Id.*).  Plaintiffs have been unable to collect the judgment entered against Calis, who is now a fugitive and the subject of an arrest warrant. (*Id.*).

**B. Procedural History**

Plaintiffs filed a complaint against Sloat and Serengeti on December 12, 2013. (D.E. No. 1).  After those Defendants filed answers, (D.E. Nos. 13, 15), the parties consented to Plaintiffs amending their complaint, (D.E. No. 28).

---

[4]       Exhibit D to the Maciag Certification is not individually paginated as it is a compilation of five orders entered in the New Jersey state court litigation.  Accordingly, the Court uses the ECF-generated page numbers that appear in the header of the document to identify specific page numbers.

On April 14, 2015, Plaintiffs filed their first amended complaint ("FAC"), which added the Guthrie Defendants.  (D.E. No. 29).  Serengeti answered and crossclaimed against the Guthrie Defendants and Sloat, (D.E. No. 30); Sloat answered and crossclaimed against the Guthrie Defendants and Serengeti, (D.E. No. 31).

The Guthrie Defendants filed a motion to dismiss for improper venue and for failure to state a claim.  (D.E. No. 40).  Serengeti opposed the Guthrie Defendants' motion to dismiss for improper venue but took no position with respect to the Guthrie Defendants' motion to dismiss for failure to state a claim.  (D.E. No. 42).  Plaintiffs opposed the Guthrie Defendants' motion to dismiss in its entirety.  (D.E. No. 43).  By order dated November 12, 2015, this Court denied the Guthrie Defendants' motion and permitted Plaintiffs to file a second amended complaint.  (D.E. No. 64).

Plaintiffs filed their Second Amended Complaint ("SAC") on December 14, 2015.  (D.E. No. 66).  The SAC asserts twelve separate counts seeking relief:

- Count 1 alleges that Sloat aided and abetted Calis's breach of fiduciary duty;

- Count 2 alleges Sloat's negligence as a bailee for failing to verify that Calis had the authority to sell the coffee;

- Count 3 alleges detrimental reliance against Sloat;

- Count 4 alleges negligence by Sloat as a bailee for failing to verify that payment was made to the titled owner of the coffee before permitting its release;

- Count 5 alleges that Sloat breached its duty as bailee of the coffee;

- Count 6 alleges that Serengeti and Sloat failed to mitigate damages;

- Count 7 alleges that Serengeti aided and abetted Calis's breach of fiduciary duty;

- Count 8 alleges Serengeti's unjust enrichment;

- Count 9 alleges Serengeti's negligence;

- Count 10[5] alleges that the Guthrie Defendants aided and abetted Calis's breach of fiduciary duty;

- Count 11 alleges unjust enrichment of the Guthrie Defendants;

- Count 12 alleges negligence by the Guthrie Defendants. (*See generally* SAC).

On January 11, 2016, Serengeti and the Guthrie Defendants filed motions to dismiss, (D.E. Nos. 71, 72); Sloat filed a motion to dismiss on January 18, 2016, (D.E. No. 73). Plaintiffs filed opposition to those motions. (D.E. Nos. 77, 78, 79).[6] On May 14, 2016, Serengeti and Sloat filed their respective replies to Plaintiffs' opposition, (D.E. Nos. 81, 82); the Guthrie Defendants did not submit a reply. The matter is now ripe for review.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure Rule 8 requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). That rule has been construed to require that a complaint, to survive dismissal, "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570

---

[5]     The SAC mistakenly labels the Counts asserted against the Guthrie Defendants. (SAC ¶¶ 82-104). The SAC's "Eighth Count" against the Guthrie Defendants, (*id.* at 18), is actually Count 10, the SAC's "Ninth Count," (*id.* at 21), is actually Count 11, and the SAC's "Tenth Count," (*id.* at 22), is actually Count 12. As such, the Court refers to those Counts as Count 10, Count 11, and Count 12.

[6]     Plaintiffs' Brief in Opposition to the Guthrie Defendants' Motion to Dismiss urges this Court to deny the Guthrie Defendants' motion because the "Guthrie Defendants have submitted two separate briefs or memoranda of law," among other asserted grounds for denial relating to the use of exhibits. (*See generally* D.E. No. 79). The Court accepts the Guthrie Defendants' motion as filed. Although it appears that the Guthrie Defendants' *notice of motion*, (D.E. No. 72), summarizes the arguments presented in their moving brief, (D.E. No. 72-1), the notice of motion does not present any arguments not already appearing in the Guthrie Defendants' moving brief. In any event, in resolving the motion, the Court will look only to the arguments and authorities as presented in the Guthrie Defendants' moving brief.

Additionally, Plaintiffs requested permission to file "a further response and opposition" to the Guthrie Defendants' filing of a motion that "correct[ed] . . . those deficiencies." (D.E. No. 79). Because that motion does not need to be corrected, the Court did not permit Plaintiffs to file "a further response." In any event, Plaintiffs' opposition to the Guthrie Defendants' Motion incorporates by reference the arguments made in Plaintiffs' Brief in Opposition to Serengeti's Motion to Dismiss, (D.E. No. 77), as the Guthrie Defendants' asserted arguments "are repetitive of the issues otherwise raised in the Sloat and Serengeti Motions to Dismiss," (D.E. No. 79).

(2007)).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a [party] has acted unlawfully."  *Id.*; *see also id.* ("[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." (quoting *Twombly*, 550 U.S. at 555)).  Notably, the court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the nonmoving party.  *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).  But the court is not required to accept "legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678 (citation omitted).

The court's inquiry is "normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged."  *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).  In its evaluation, the court may consider the complaint, documents submitted with the complaint, matters incorporated by reference or integral to the claims, matters of which the Court may take judicial notice, matters of public record, orders, and other items of record in the case.  *See FTC v. Wyndham Worldwide Corp.*, 10 F. Supp. 3d 602, 609 (D.N.J. 2014) (citations omitted).

## IV. DISCUSSION

### A. Defendants' Threshold Arguments for Dismissal

#### 1. <u>Article III Standing</u>

All Defendants assert that Plaintiffs lack Article III standing to bring this action.  (*See* D.E. No. 71-4, Memorandum of Law in Support of Serengeti's Motion to Dismiss ("Ser. Mov. Br.") at 13-14; D.E. No. 73-1, Brief in Support of Sloat's Motion to Dismiss ("Sloat Mov. Br.") at 22; D.E.

No. 72-1, Memorandum in Support of the Guthrie Defendants' Motion to Dismiss ("Guthrie Mov. Br.") at 15-29).

"A motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007) (citations omitted). "A motion to dismiss for lack of subject matter jurisdiction pursuant to [Rule] 12(b)(1) which is filed prior to answering the complaint is considered a 'facial challenge' to the court's subject matter jurisdiction." *Bellocchio v. New Jersey Dep't of Envtl. Prot.*, 16 F. Supp. 3d 367, 373-74 (D.N.J. 2014) (citing *Cardio-Med. Assocs., Ltd. v. Crozer-Chester Med. Ctr.*, 721 F.2d 68, 75 (3d Cir. 1983)), *aff'd*, 602 F. App'x 876 (3d Cir. 2015). "This is distinct from a factual attack on the court's subject matter jurisdiction which can only occur after the answer has been served." *Id.* at 374 (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891-92 & n.17 (3d Cir. 1977)).

As noted previously, all Defendants have filed Motions to Dismiss in lieu of filing answers to the SAC. Accordingly, Defendants' challenge to Plaintiffs' standing is a facial attack, "asserting that [P]laintiffs' complaint, on its face, does not allege sufficient [facts] . . . to warrant the court in taking jurisdiction."[7] *Cardio-Med. Assocs.*, 721 F.2d at 75. "In reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Gould Elecs. Inc. v. United States*, 220 F.3d

---

[7] Defendants attach exhibits in support of their arguments that Plaintiffs lack standing. (*See* Kamvosoulis Cert., Ex. B; D.E. Nos. 72-2 to -6, Exhibits in Support of the Guthrie Defendants' Motion to Dismiss). But, as Plaintiffs assert, discovery has not been completed in this matter and, in fact, has been stayed. (*See* D.E. No. 64). Accordingly, at this stage, a factual analysis as to standing is inappropriate because the Court is not presented with a complete record that would allow a final determination as to the facts governing Plaintiffs' standing here. *See NJSR Surgical Ctr., L.L.C. v. Horizon Blue Cross Blue Shield of N. J., Inc.*, No. 12-753, 2014 WL 2854707, at *4 (D.N.J. June 23, 2014). Therefore, this Court follows the Third Circuit's direction that "Rule 12(b)(1) motions brought at this stage in a litigation will be assessed as facial attacks." *Id.* (citing *Cardio-Med. Assocs.*, 721 F.2d at 75); *see also Moore v. Angie's List, Inc.*, 118 F. Supp. 3d 802, 812-13 (E.D. Pa. 2015) (refusing to consider the defendant's "factual recital" to challenge the plaintiff's standing where the defendant filed its motion to dismiss before answering the complaint).

169, 176 (3d Cir. 2000) (citing *Mortensen*, 549 F.2d at 891), *modified on other grounds*, *Simon v. United States*, 341 F.3d 193 (3d Cir. 2003).

To establish Article III standing, a plaintiff must allege (1) an injury in fact that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) that the injury is "fairly traceable to the challenged action of the defendant"; and (3) that it is likely "that the injury will be redressed by a favorable decision." *Freedom from Religion Found. Inc. v. New Kensington Arnold Sch. Dist.*, No. 15-3083, 2016 WL 4191499, at *4 (3d Cir. Aug. 9, 2016) (citation and internal quotation marks omitted). Additionally, prudential standing requires that the asserted harm ordinarily may not be a "generalized grievance," and that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (citations omitted).

Here, the SAC alleges adequate facts to establish that Plaintiffs have both Article III and prudential standing. Plaintiffs' alleged harm is actual and concrete; they allege they "have been unable to collect on [the state court judgment] due to the wrongful conversion of the $2.8 [m]illion in [coffee], and due to the diversion of the $1.423 [m]illion in funds to the Calis-controlled RaboBank account rather than to the Fisher & Phillips Trust Account as required." (SAC ¶ 22). Plaintiffs allege harm to their individualized interests: the state court judgment allegedly "was entered against Calis and in favor of George Willekes, Mark Willekes, and Robert Willekes individually." (*Id.*). And, Plaintiffs allege that Defendants herein were, in several ways, responsible for the funds being diverted and unavailable to satisfy the state court judgment in their favor. (*See, e.g.*, *id.* ¶¶ 23-27, 62-66, 82-94 (alleging aiding and abetting Calis's breach of fiduciary duty against all Defendants)). Finally, it appears likely from the SAC that a favorable decision will redress Plaintiffs' alleged injury.

Accordingly, the Court finds that Plaintiffs have adequately alleged standing, and Defendants' Motions to Dismiss for lack of standing are denied *without prejudice*. *See Mortensen*, 549 F.2d at 891-92 (noting that an appropriate 12(b)(1) factual attack "may occur at any stage of the proceedings, from the time the answer has been served until after the trial has been completed").

## 2. **Entire Controversy Doctrine**

Serengeti and Sloat move to dismiss the SAC on the ground that this action is barred by New Jersey's entire controversy doctrine.  (*See* Ser. Mov. Br. at 10-13; Sloat Mov. Br. at 8-13).  But, as Plaintiffs point out, neither Serengeti nor Sloat asserted the entire controversy doctrine as an affirmative defense to the original complaint or the FAC.  (*See* D.E. No. 77, Plaintiffs' Brief in Opposition to Serengeti's Motion to Dismiss ("Pl. Ser. Opp. Br.") at 13; D.E. No. 78, Plaintiffs' Brief in Opposition to Sloat's Motion to Dismiss ("Pl. Sloat Opp. Br.") at 14).

The entire controversy doctrine is "an affirmative defense pursuant to" Federal Rule of Civil Procedure 8(c).  *Rycoline Prods., Inc. v. C & W Unlimited*, 109 F.3d 883, 886 (3d Cir. 1997).  As an affirmative defense, it is "waived if not pleaded or otherwise timely raised." *Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 137 (3d Cir. 1999) (citation omitted).

Here, Plaintiffs filed the original complaint on December 12, 2013.  (D.E. No. 1).  Neither Sloat nor Serengeti raised the entire controversy doctrine as an affirmative defense in their respective answers to the original complaint.  (*See* D.E. No. 13 at 12-13; D.E. No. 15 at 7-8). Plaintiffs filed their FAC on April 14, 2015.  (D.E. No. 29).  Again, neither Serengeti nor Sloat raised the entire controversy doctrine in response.  (*See* D.E. No. 30 at 17-18; D.E. No. 31 at 9-10).  Plaintiffs filed the SAC on December 14, 2015, (D.E. No. 66), and only in these Motions,

filed in early January 2016, do Sloat and Serengeti argue, for the first time, that this action is barred by the entire controversy doctrine.  (*See* Ser. Mov. Br. at 10-13; Sloat Mov. Br. at 8-12).

Defendants have waived their entire controversy doctrine defense because they did not assert it as an affirmative defense in their two prior opportunities to do so, and failed to timely raise the defense.[8]  *See Kirtley v. Wadekar*, No. 05-5383, 2007 WL 1963018, at *5 (D.N.J. July 2, 2007) ("Defendants filed their original motion to dismiss in lieu of an answer on May 5, 2006. Defendants did not raise the entire controversy doctrine in that initial responsive pleading. Defendants have waived their entire controversy doctrine defense.").  Accordingly, Sloat's and Serengeti's respective motions to dismiss the SAC on entire controversy grounds are denied.

**B. The November 2011 Order**

Resolution of these Motions' remaining issues largely depends on the language of the November 2011 Order and the rights and duties it established.  The November 2011 Order states:

IT IS on this 7th day of November, 2011

ORDERED and ADJUDGED that:

1. Paragraph 5 of this Court's Order of June 18, 2010 be and is hereby vacated.

2. ECBV shall, as soon as possible, sell the coffee stocks being held in storage at The Annex in California ("Coffee[\"]") in a commercially reasonable manner and in an arms-length transaction(s).

3. ECBV, with Clemens M.B. Calis as the Chief Operating Officer, shall be responsible for the marketing and sales of the Coffee.

4. ECBV shall be responsible for all expenses relating to the sale of the Coffee, including storage costs and direct costs of sale such as but not limited to brokers' fees and transportation fees.

---

[8]     The New Jersey Supreme Court permitted the assertion of the entire controversy doctrine in a case where the defendant did not assert it until the answer to the first amended complaint, over two years after the initial complaint was filed.  *Oliver v. Ambrose*, 705 A.2d 742, 751 (N.J. 1998).  Notwithstanding that flexibility, this Court declines to permit the defense in this case, as the considerations of fairness present in *Oliver*—where the same parties had been involved in multiple suits concerning the same underlying facts for years prior—do not apply to this matter, where Defendants were never involved in a prior suit with Plaintiffs and missed two opportunities to assert the entire controversy doctrine.

. . . .

6. After deducting the payments to the Annex, . . . and the payments for the direct
costs of marketing and selling the Coffee (such costs being only those incurred in
the ordinary course of business), the net proceeds of the sale of the Coffee shall
until further Order of the Court be distributed to the trust account of Fisher and
Phillips ("Escrow Money").

. . . .

7. ECBV shall provide Defendants with bi-monthly reports relating to the
marketing and sale of the Coffee.  These reports, which shall be due on the 15th
and 30th of each month [or] on the following business day except the first report
shall be November 30, 2011, and shall include but not be limited to copies of
contracts, invoices, bank account statements and accounting records showing the
direct costs of each sale.

8. In the event[] there is an objection to any cost or sale of the Coffee, counsel for
Defendants shall provide written notice of such objection to counsel for Plaintiffs.
If the objection is not resolved within three (3) business days, the objection may be
brought to the attention of the Court.

(*See* 11/7/11 Order).

Paragraph 1 of the November 2011 Order vacates paragraph 5 of the June 18, 2010 Order,

(*id.* ¶ 1), to which Plaintiffs refer often in the SAC.  Paragraph 5 of the June 18, 2010 Order states

as follows:

Pending the entry of an Order memorializing the balance of the Court's rulings on
June 17, 2010, ECBV shall not enter into any contracts relating to the sale of the
Coffee, no sales may be concluded, no title to the stock may change hands, and no
coffee may be shipped from the warehouse, with the exception of providing
samples to distributors and customers and for testing purposes.

(*See* D.E. No. 71-2, Kamvosoulis Cert., Ex. C, June 18, 2010 Order ("6/18/10 Order") ¶ 5).

Plaintiffs' allegations in the SAC relating to the November 2011 Order take a decidedly

different view of what it actually says.  According to Plaintiffs:

On November 7, 2011[,] a Court Order (the "November 7, 2011 Order") was
entered in the Willekes-Calis dispute, which Order was [s]elf-evidently NOT a final
order or final judgment, because it, *inter alia*, (a) provided that Calis could begin

marketing the Goods but could not actually sell or transfer any of the Goods (other than providing small samples to potential buyers) without further review of any proposed sales by the Court and the Willekes parties; (b) which scheduled further Court hearings, filings of briefs and papers, and Depositions;, and (c) which ordered that if at some future date a sale was ever validly[]authorized the sale purchase funds must be wired only to the Attorney Trust Account of Fisher & Phillips, Attorneys at Law, New York, N.Y., which was the Attorney Trust Account of the Court-appointed Special Master, Cynthia F. Jacob Esq.

(SAC ¶ 16).

For the following reasons, the Court finds that Plaintiffs' interpretation of the November 2011 Order is untenable, unsupported by the actual language, and, frankly, incorrect.[9] *Cf. ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 n.8 (3d Cir. 1994) ("Where there is a disparity between a written instrument annexed to a pleading and an allegation in the pleading based thereon, the written instrument will control." (citation omitted)).

Plaintiffs say that the November 2011 Order "provided that Calis could *begin marketing the Goods* but *could not actually sell or transfer* any of the Goods (*other than providing small samples to potential buyers*) without further *review of any proposed sales by the Court and the Willekes* parties." (SAC ¶ 16 (emphasis added)). That emphasized language appears nowhere in the November 2011 Order.

And, such language is expressly contradicted by the November 2011 Order's language, which states that: "ECBV *shall, as soon as possible, sell the coffee stocks* being held in storage at

---

[9]      Plaintiffs attach to their certification in opposition to Defendants' Motions to Dismiss an order and statement of reasons denying partial summary judgment to Calis on the issue of allocating the proceeds of the sale of the coffee. (*See* D.E. No. 80-4, Exhibit D to Maciag Cert. at ECF pp. 2-5). That statement of reasons, authored by the same judge who entered the November 2011 Order, Judge Weisenbeck, states that "[o]n November 7, 2011, concluding that it retained jurisdiction, the Court entered an Order *directing the sale* of the [c]offee with the *net proceeds of the sale to be held in trust*; reimbursing plaintiffs from the *net proceeds* for 50% of the Expert's fee; and directing the parties to file papers with respect to the allocation issue." (*Id.* at ECF p. 4). Thus, Plaintiffs' own exhibit directly contradicts two important allegations concerning the November 2011 Order: Plaintiffs' repeated allegation that "Calis could begin marketing the [coffee] but could not actually sell or transfer any of the [coffee]," (SAC ¶ 16), and Plaintiffs' likewise oft-repeated allegation that all of the sale purchase funds—*i.e.*, the gross proceeds of any sale—rather than the net proceeds of the sale were required to be deposited in the Trust Account, (*e.g.*, *id.* ¶¶ 16, 24, 63, 91). That exhibit clearly cuts further against Plaintiffs' allegations as to the November 2011 Order.

12

The Annex in California . . . in a commercially reasonable manner and in an arms-length transaction(s)," (11/7/11 Order ¶ 2 (emphasis added)); "ECBV, *with Clemens M.B. Calis as the Chief Operating Officer*, *shall be responsible for the marketing and sales* of the Coffee," (*id.* ¶ 3 (emphasis added)); and "[a]fter deducting the payments to the Annex, . . . and the payments for the direct costs of marketing and selling the Coffee (such costs being only those incurred in the ordinary course of business), *the net proceeds of the sale* of the Coffee shall until further Order of the Court be distributed to the trust account of Fisher and Phillips," (*id.* ¶ 6).

Furthermore, contrary to Plaintiffs' allegations that the June 18, 2010 Order continued to restrict the sale or removal of the coffee, (*see* SAC ¶ 31), any such restriction was vacated pursuant to the November 2011 Order, paragraph 1, (11/7/11 Order ¶ 1 (vacating 6/18/10 Order ¶ 5)).

The November 2011 Order is clear.  It *orders* that the coffee should be sold, and it *orders* that *Calis* is "responsible" for its sale.  (*Id.* ¶¶ 2, 3).  It also *orders* ECBV to bear the expenses relating to the sale—including storage costs and brokers' fees—and *orders* that, *after deducting* such expenses, *the net proceeds of the sale* must be placed in the Trust Account.  (*Id.* ¶¶ 4, 6). And, the November 2011 Order vacated paragraph 5 of the June 18, 2010 Order, expressly lifting the restrictions the latter placed on selling or entering into contracts to sell the coffee, shipping the coffee from the warehouse, and transferring title.  (*Id.* ¶ 1 (vacating 6/18/10 Order ¶ 5)).

With this exposition of the November 2011 Order's directives in mind, the Court turns to analysis of Defendants' arguments for dismissal of the SAC.

## C. Analysis of Defendants' 12(b)(6) Arguments

### 1. Count 1, Count 7 & Count 10 – Aiding and Abetting as to all Defendants

#### i. *Legal Standard - Aiding and Abetting a Breach of Fiduciary Duty*

In Counts 1, 7, and 10, Plaintiffs assert that Sloat, Serengeti, and the Guthrie Defendants, respectively, aided and abetted Calis's breach of fiduciary duty.  (SAC ¶¶ 23-27, 62-66, 82-94).

"To establish a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must allege: (1) a breach of fiduciary duty; (2) the defendant's knowledge of and substantial assistance in that breach; and (3) damages resulting from the breach."  *Wiatt v. Winston & Strawn LLP*, 838 F. Supp. 2d 296, 307 (D.N.J. 2012) (citing *State, Dep't of Treasury, Div. of Inv. ex rel. McCormac v. Qwest Commc'ns Int'l, Inc.*, 904 A.2d 775, 783 (N.J. Super. Ct. App. Div. 2006)); *see also Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 174 (3d Cir. 2002) ("In order to be found liable for aiding and abetting a breach of a fiduciary duty, one must demonstrate that the party knew that the other's conduct constituted a breach of a fiduciary duty and gave substantial assistance or encouragement to the other in committing that breach." (citation omitted)).[10]

"A claim for aiding and abetting . . . also requires proof of the underlying tort . . . ." *McCormac*, 904 A.2d at 784.  So, in the case of aiding and abetting a breach of fiduciary duty, a plaintiff must prove an underlying breach of fiduciary duty in order to prevail.  *See id.*  To state a claim for breach of fiduciary duty, a plaintiff must allege: "(1) the existence of a fiduciary relationship between the parties; (2) the breach of a duty imposed by that relationship; and (3)

---

[10]     As all parties appear to agree that New Jersey law controls this case, (*see generally* Ser. Mov. Br.; Sloat Mov. Br.; Guthrie Mov. Br. at 5; Pl. Ser. Opp. Br.; Pl. Sloat Opp. Br.), the Court applies New Jersey law here.  *See UBI Telecom Inc. v. KDDI Am., Inc.*, No. 13-1643, 2014 WL 2965705, at *9 (D.N.J. June 30, 2014); *Sager v. Hoffman–La Roche, Inc.*, 2012 WL 3166630, at * 14 n.9 (N.J. Super. Ct. App. Div. Aug. 7, 2012) (per curiam) ("Because the parties agree that Florida substantive law applies here, we need not engage in the choice of law analysis otherwise called for by [New Jersey law], examining which State has the most significant relationship to each case.").

damages or harm to the plaintiff caused by said breach." *SalandStacy Corp. v. Freeney*, No. 11-3439, 2012 WL 959473, at *12 (D.N.J. Mar. 21, 2012) (citations omitted).

### ii. *Analysis*

Each of the Defendants levies various arguments attacking Plaintiffs' aiding-and-abetting causes of action. (*See* Ser. Mov. Br. at 15-16; Guthrie Mov. Br. at 6-10; Sloat Mov. Br. at 13-15). The Court need not address all of those arguments[11] because Plaintiffs have failed to satisfy the second element of the "underlying tort": breach of a duty imposed by a fiduciary relationship. Put simply, Plaintiffs ascribe a fiduciary duty to Calis that Calis did not owe. Consequently, Defendants cannot be liable for aiding and abetting the breach of a non-existent fiduciary duty.

Plaintiffs allege that "Calis had a fiduciary duty, pursuant to the terms of the November 7, 2011 Order, to turn over *all proceeds of any sale or transfer* of the [coffee] to the . . . Trust Account."[12] (SAC ¶¶ 24, 63, 91). Plaintiffs further allege that "Calis breached that fiduciary duty, in that he arranged for transfer of $1.423 [m]illion in proceeds of [t]he [p]urported [s]ale to be wired NOT to the . . . Trust Account . . . , but rather to a personal overseas Rabobank account

---

[11]     One particular argument the Court will address is Serengeti's position that Plaintiffs "cannot prove . . . a breach of fiduciary duty against Mr. Calis" because "[h]e is not a party to this case, . . . does not have the opportunity to defend himself" and, thus, "it would simply be inequitable for the Court to permit this claim to proceed in his absence." (Ser. Mov. Br. at 15). Serengeti does not provide any authority to support its claim of "inequit[y]" in permitting the aiding-and-abetting claim to proceed in Calis's absence. More fundamentally, at the motion to dismiss stage, the Court's inquiry is not whether Plaintiffs can ultimately prove that Calis breached his fiduciary duty, but whether Plaintiffs have stated a claim as to that breach. *Bondi v. Citigroup, Inc.*, No. BER-L-10902-04, 2005 WL 975856, at *18 (N.J. Super. Ct. Law Div. Feb. 28, 2005) ("Although it goes without saying that plaintiff still needs to convince a trier of the facts that what it alleges is true, the multiple factual scenarios illustrated in the complaint present viable claims for relief under a theory of aiding and abetting breaches of fiduciary duties."), *remanded on other grounds*, 185 N.J. 32, 878 A.2d 850 (2005).

[12]     Sloat suggests that a fiduciary relationship does not exist in this case. (Sloat Mov. Br. at 13). Sloat does not elaborate on that argument, nor does Sloat cite any authority in support. Plaintiffs' opposition does not address this argument. (Pl. Sloat Opp. Br. at 20-22). For purposes of resolving these Motions, the Court finds that Plaintiffs have alleged sufficient facts to plead the existence of a fiduciary relationship between Calis and Plaintiffs because Plaintiffs have alleged that Calis was responsible for depositing sale proceeds in an account from which Plaintiffs' appropriate allotment of certain funds would have derived. *In re Cendant Corp. Sec. Litig.*, 139 F. Supp. 2d 585, 609 (D.N.J. 2001) ("Under . . . New Jersey . . . law, a fiduciary relationship exists when one person is 'under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship.'" (quoting *F.G. v. MacDonell*, 696 A.2d 697, 704 (N.J. 1997))).

controlled by Calis individually." (*Id.* ¶¶ 25, 64, 92). So, Plaintiffs allege that Defendants aided and abetted Calis's failure to turn over *all* proceeds to the Trust Account. (*See id.* ¶¶ 24, 25, 27 (as to Sloat); 63, 64, 66 (as to Serengeti); 91, 92, 94 (as to the Guthrie Defendants)).

But the November 2011 Order required the *net* proceeds of any sale of the coffee to be deposited in the Trust Account, not *all* proceeds. (*See* 11/7/11 Order ¶ 6). Nowhere does the Order state that Calis was required to deposit all proceeds. Indeed, that Order expressly states that "[a]fter deducting the payments to the Annex, . . . and the payments for the direct costs of marketing and selling the Coffee . . . , the *net proceeds* of the sale of the Coffee shall . . . be distributed to the trust account . . . ." (*Id.* (emphasis added)). Furthermore, the Order's directions as to the deduction of certain costs and the deposit of net proceeds excludes the possibility that Calis would be required immediately to turn over the entire sale proceeds of any transaction—if Calis were to have deposited *all* proceeds into the Trust Account, he would not have been able to pay any costs, which was his responsibility as Chief Operating Officer of ECBV. (*See id.* ¶¶ 3, 4, 6). The Order contemplates the gross proceeds of a sale being turned over to someone—even Calis—*before* costs were deducted and the net proceeds were deposited in the Trust Account. Thus, Plaintiffs are attempting to foist responsibilities upon Calis greater than what the November 2011 Order contemplated.

Accordingly, Plaintiffs' attempt to hold Defendants liable for aiding and abetting Calis's failure "to turn over *all* proceeds of any sale," (SAC ¶¶ 24, 63, 91 (emphasis added)), must be rejected. Stated differently, Plaintiffs fail to state a claim for aiding and abetting Calis's breach of fiduciary duty because the SAC fails to allege that Calis breached the fiduciary duty allegedly created by the November 2011 Order; instead, Plaintiffs allege the breach of a duty that Calis did not owe. Therefore, Plaintiffs have failed to satisfy the second element of "the underlying tort,"

the breach of a fiduciary duty.  *See McCormac*, 904 A.2d at 784; *SalandStacy Corp.*, 2012 WL 959473, at \*12.

It follows that none of the Defendants could have "known of" or "substantially assisted in" the breach alleged in the SAC because that alleged breach is not of a fiduciary duty contemplated by the November 2011 Order.  If Defendants had known of and substantially assisted in Calis's failure to deposit *all* the proceeds in the Trust Account, they would not have aided and abetted any breach, because the duty created by the November 2011 Order was to turn over *net* proceeds.

As such, Counts 1, 7, and 10 must be dismissed for failure to state a claim.  Pursuant to Plaintiffs' requests, (*see* Pl. Ser. Opp. Br. at 24; Pl. Sloat Opp. Br. at 28; D.E. No. 79, Plaintiffs' Brief in Opposition to the Guthrie Defendants Motion to Dismiss ("Pl. Guthrie Opp. Br.") at 5), the Court will permit Plaintiffs leave to amend Counts 1, 7, and 10, because it is theoretically possible that such an amendment may state a claim for aiding and abetting a breach of fiduciary duty.  *Phillips*, 515 F.3d at 236 ("[I]f a complaint is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." (citation omitted)).[13]

### 2.  Count 2, Count 4 & Count 5 – Sloat's Alleged Breaches as Bailee

In Counts 2, 4, and 5 of the SAC, Plaintiffs seek to hold Sloat liable as a bailee of the coffee.  Count 2 of the SAC alleges negligence by Sloat for failing to discharge its duty "as a

---

[13]    While the Court does not find that amendment would be inequitable, the Court does harbor some doubt in respect of Plaintiffs' ability to state a plausible claim for aiding and abetting a breach of fiduciary duty against Defendants in an amended complaint.  As discussed, Plaintiffs would have to allege the breach of a cognizable fiduciary duty under the November 2011 Order.  But beyond that, Plaintiffs would, of course, be required to allege facts making it plausible that Defendants knew of and substantially assisted in Calis's breach of such a duty.  The Court's skepticism of Plaintiffs' chances of doing so derives from the SAC's present allegations.  Accordingly, the Court cautions Plaintiffs only to amend Counts 1, 7, and 10 to the extent Plaintiffs believe that the facts support allegations giving rise to the reasonable inference that Defendants are liable for what Plaintiffs allege.  And, the Court advises that any future dismissal of these Counts will be *with prejudice*.

warehouseman and bailee of the [coffee]" to verify that Calis had the right to transfer or sell the coffee.  (*See* SAC ¶ 37).  In Count 4 of the SAC, Plaintiffs allege that "Sloat as warehouseman and bailee, had a duty not to release [the coffee], absent proof that payment for [the coffee] had been made to the titled owner."  (*Id.* ¶ 48).  Count 5 alleges that "Sloat had a duty, as warehouseman and bailee of the [coffee] to use ordinary standards of care, and standards of care in the warehousing business, to ensure that [the sale] was a valid transaction, before agreeing to release the [coffee] from Sloat's warehouse."  (*Id.* ¶ 53).

"In New Jersey, a property owner (the 'bailor') may sue someone in possession of the property (the 'bailee') for negligence pursuant to a bailment relationship."  *Glob. Strategies, Inc. v. Harbor Freight Transp. Corp.*, No. 14-6354, 2015 WL 6737024, at *2 (D.N.J. Nov. 2, 2015).  "A bailment relationship exists when a bailor gives his property to a bailee 'for a purpose, with the express or implied understanding that the property will be returned in at least the same condition after the purpose for which they were given has been fulfilled.'"  *Id.* (citation omitted); *see also Sgro v. Getty Petroleum Corp.*, 854 F. Supp. 1164, 1175 (D.N.J. 1994) ("The elements of 'bailment' are delivery of personal property by one person to another in trust for a specific purpose, acceptance of such delivery, and express or implied agreement to carry out the trust and return the property to the bailor." (citations omitted)).  A bailor is defined as "a person who delivers personal property to another to be held in a bailment."  8A Am. Jur. 2d *Bailments* § 2; *see also Sgro*, 854 F. Supp. at 1175; *Glob. Strategies, Inc.*, 2015 WL 6737024, at *2.

Here, Counts 2, 4, and 5 must be dismissed for failure to state a claim because Plaintiffs have not alleged the existence of a bailment relationship.  The SAC does not allege that Plaintiffs were bailors of the coffee.  Nowhere do Plaintiffs allege that they delivered the coffee to Sloat, or that the coffee was theirs to deliver.  Instead, the SAC alleges: "During 2005, 2006 and 2007,

Defendant Sloat entered into warehouse bailment agreements for the storage of approximately 5,500 bags of coffee beans, totaling more than 770,000 lbs. of coffee . . . at a warehouse operated by [Sloat] . . . ."  (SAC ¶ 12).  As that is the sole allegation relating to the alleged bailment relationship, clearly, Plaintiffs do not allege that they were bailors of the coffee.

Plaintiffs do allege that the ownership of the coffee was the subject of a 2010 litigated dispute between Calis, Plaintiffs, "and other claimants," and that "the Plaintiffs herein had an individual ownership interest in the [coffee]" because of their status as counterclaimants and intervenors in the 2010 litigation.  (*Id.* ¶¶ 13, 14).  But those allegations are insufficient to permit the inference that Plaintiffs were bailors of the coffee in 2005, 2006, and 2007, when the alleged bailment agreements were allegedly entered into.  *Cf. Glob. Strategies, Inc.*, 2015 WL 6737024, at *1-3 (finding that the plaintiff "established the creation of a bailment relationship" by, *inter alia*, alleging that the defendant took possession of plaintiff's property).

Plaintiffs argue that "[i]t is axiomatic that Plaintiff[s] . . . , as 78% shareholders of the E[uropean ]C[offee] Group, have the right to enforce [the] bailment agreements."  (Pl. Sloat Opp. Br. at 25).  Plaintiffs cite no authority to support this proposition.  (*Id.*).  And, in any event, the percentage of Plaintiffs' alleged ownership in any company does not appear in the SAC.  Of course, Plaintiffs may not amend their SAC by way of argument in a brief.  *Pa., ex rel. Zimmerman v. Pepsico, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) (noting that a "complaint may not be amended by the briefs in opposition to a motion to dismiss" (citation and internal quotation marks omitted)).

Accordingly, Counts 2, 4, and 5 are dismissed *without prejudice* for failure to state a claim.[14]  Plaintiffs may amend the SAC to assert claims against Sloat arising from a bailment

---

[14]     To the extent Plaintiffs allege under Count 2 that the November 2011 Order gave rise to a duty on the part of Sloat to verify Calis's authority to sell the coffee, Plaintiffs' claim must be dismissed *with prejudice*.  Plaintiffs allege that Sloat's duty stemmed from "court orders entered in 2010 and 2011," which gave Sloat "actual knowledge of the cloud over the [t]itle" to the coffee.  (SAC ¶¶ 34, 37).  But, as discussed above, the November 2011 Order expressly

relationship with Plaintiffs, if Plaintiffs can plausibly allege such a relationship.[15]  The Court advises Plaintiffs that any future dismissal of these Counts will be *with prejudice*.

### 3. Count 3 – Plaintiffs' "Detrimental Reliance" on Sloat's Alleged Promise

Plaintiffs' Count 3, "Detrimental Reliance" as to Sloat, alleges that, in March 2010, Sloat, through its attorney, "promised that it would not allow the release of the [coffee] . . . until the dispute was resolved." (SAC ¶ 42).  Specifically, Plaintiffs point to the following statement from Sloat's attorney: "This puts my client squarely in the middle of a dispute, not created by my client, over the ownership of the coffee.  *Under these circumstances, my client cannot release any of the coffee*." (*Id.*).  Plaintiffs allege that they "relied, to their detriment," on that promise; "[a]s a result . . . , the Willekes parties lost $2.8 [m]illion when Sloat dishonored its promise and wrongfully released the [coffee]." (*Id.* ¶¶ 44, 45).

Sloat contends that Count 3 must be dismissed because (1) detrimental reliance is not a cause of action; and (2) even if Count 3 is construed as a claim for promissory estoppel, the SAC

---

directed that the coffee be sold as soon as possible, and that ECBV, with Calis as the Chief Operating Officer, would be responsible for the marketing and sale of the coffee. (11/7/11 Order ¶¶ 2, 3).  Thus, contrary to Plaintiffs' contentions, the November 2011 Order did not create a duty of Sloat to verify Calis's authority to sell the coffee; rather, the Order explicitly *provided* Calis the authority to sell.

Similarly, under Count 4, Plaintiffs suggest that the November 2011 Order created a duty on the part of Sloat to ensure that sale proceeds were wired to the Trust Account before Sloat could release the coffee. (*See* SAC ¶¶ 47, 48).  As a matter of law, any such allegations are insufficient to state a claim.  Nowhere does the Order require Sloat— or any other party—to verify that the sale proceeds were deposited in the Trust Account.  Nor does the Order place any restriction on the release of the coffee.  In fact, as already discussed, the Order vacated the June 18, 2010 Order's restrictions on removing the coffee from the warehouse.  Accordingly, the November 2011 Order did not create a duty on the party of Sloat to verify that payment was made to a particular account before Sloat could release the coffee.

[15]     An additional issue with regard to Count 4 is worth addressing.  Sloat argues that, "as a warehouse and bailee, [it] has no obligation to verify how much, or what type of payment is made by a purchaser of goods." (Sloat Mov. Br. at 19).  Rather, Sloat maintains that its duty is limited to delivering the goods pursuant to the bailor's instructions— in this case, European Coffee. (*Id.*).  To the extent Plaintiffs amend their complaint to establish a bailment relationship with Sloat, the Court finds Sloat's arguments unpersuasive.  As an initial matter, Sloat cites no authority to support those propositions.  Further, the record is silent as to the identity of the bailor of the coffee; neither the SAC nor the documents submitted in support of Sloat's motion identify European Coffee as the bailor.  New Jersey law places a duty on a warehouseman and bailee to exercise the same care over goods in its possession as would a reasonably careful person under the circumstances.  *See* N.J.S.A. 12A:7-204(a).  Therefore, in the event Plaintiffs bring valid claims arising from their alleged bailment relationship with Sloat, the Court cannot say, absent some cited authority, that Sloat's duty could not encompass ensuring that payment was made in a particular manner.

fails to state a claim, as Plaintiffs have failed to allege facts establishing a clear and definite promise.  (Sloat Mov. Br. at 17-18).

Plaintffs argue in opposition that Count 3 is adequately pleaded as a claim for promissory and equitable estoppel, and that a question of fact for a jury exists as to whether Sloat reasonably concluded that "circumstances" had changed such that it decided to release the coffee.  (Pl. Sloat Opp. Br. at 23-24).

As a threshold matter, "detrimental reliance" is not a cause of action, it is an element of promissory or equitable estoppel.  *See, e.g.*, *E. Orange Bd. of Educ. v. New Jersey Sch. Const. Corp.*, 963 A.2d 865, 875 (N.J. Super. Ct. App. Div. 2009) (outlining elements of promissory estoppel).  But to the extent Plaintiffs may be seeking to assert promissory or equitable estoppel claims, the Court determines that the SAC fails to state a claim.

 To state a claim for promissory estoppel, a plaintiff must allege (1) "a clear and definite promise"; (2) "made with the expectation that the promisee will rely upon it"; (3) that the promisee reasonably relied upon the promise; and (4) that the promisee's reliance on the promise resulted "in definite and substantial detriment."  *See id.* (citation and internal quotation marks omitted). The underlying justification for promissory estoppel is avoidance of "the substantial hardship or injustice which would result if such a promise were not enforced."  *Schweikert v. Baxter Healthcare Corp.*, No. 12-5876, 2015 WL 4578443, at *14 (D.N.J. July 29, 2015) (citation and internal quotation marks omitted).

To state a claim for equitable estoppel, a plaintiff "must show that the alleged conduct was done, or representation was made, intentionally or under such circumstances that it was both natural and probable that it would induce action.  Further, the conduct must be relied on, and the relying party must act so as to change his or her position to his or her detriment."  *Id.* at *15

21

(citation and internal quotation marks omitted).  "The doctrine of equitable estoppel is applied only in very compelling circumstances, where the interests of justice, morality and common fairness clearly dictate that course."  *Id.* (citation and internal quotation marks omitted).

Plaintiffs fail to state a claim for promissory estoppel because Sloat's attorney's statement—"Under these circumstances, my client cannot release any of the coffee," (SAC ¶ 42)— is not a clear and definite promise; thus, Plaintiffs cannot establish the first element, which "is considered the sine qua non for applicability of this theory of recovery."  *Schweikert*, 2015 WL 4578443, at *15 (citation and internal quotation marks omitted).  To be sure, Sloat's attorney's "promise" was conditional—the coffee would not be released so long as the circumstances remained the same.  Put differently, a contingency—"these circumstances" remaining in place— was required for the promise to remain in effect.  Such a conditional promise is not clear and definite. *See Watson v. City of Salemi*, 934 F. Supp. 643, 661 (D.N.J. 1995) (concluding that the plaintiff's promissory estoppel claim failed because "the promise made to Plaintiff was clearly conditional and contingent, as opposed to clear and definite"); *Schweikert*, 2015 WL 4578443, at *15 ("Defendants' promise to pay a Stay Bonus to Plaintiff pursuant to the Stay Bonus Agreement was conditional, as in contingent upon Plaintiff remaining an employee until July 2, 2012 and upon Defendants' discretion in the event that Plaintiff was involuntarily terminated.").

The SAC also fails to state a claim for equitable estoppel.  Nowhere does the SAC allege that Sloat's conduct or representation—whether Sloat's attorney's statement or otherwise—was made to induce action on Plaintiffs' part or that Plaintiffs acted so as to change their position to their detriment.  (*See* SAC ¶¶ 39-45).  Indeed, the allegations under Count 3 do not allege any facts suggesting that Plaintiffs acted in reliance on Sloat's conduct.  Rather, Plaintiffs merely allege that they "relied, to their detriment, on the promise by Defendant Sloat."  (*Id.* ¶ 44).  Clearly, that

"allegation" is a mere rehashing of the elements of a cause of action and fails under *Iqbal*/*Twombly*. *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (citation omitted)).

Because the statement on which Plaintiffs rely to allege promissory estoppel was not a clear and definite promise, Plaintiffs' Count 3 for promissory estoppel is dismissed.  The Court finds that amendment would be futile, because no amendment would make that alleged "promise" clear and definite.  Accordingly, Plaintiffs' promissory estoppel claim is dismissed *with prejudice*.

However, it is possible that Plaintiffs may be able to state a claim for equitable estoppel. To do so, Plaintiffs must allege facts sufficient to make plausible the claim that Sloat engaged in conduct or made a representation that it intended to or understood would induce Plaintiffs to act so as to change their position to their detriment.  *See Schweikert*, 2015 WL 4578443, at *15.  And, Plaintiffs must allege facts making it plausible that Plaintiffs relied on Sloat's conduct to their detriment—*i.e.*, that Plaintiffs acted so as to change position.  *See id.*  Plaintiffs are permitted to amend their complaint to bring an equitable estoppel claim, but Plaintiffs are advised that any subsequent dismissal will be *with prejudice*.

**4.   Count 6 – Sloat's and Serengeti's Alleged Failure to Mitigate Damages**

Plaintiff alleges in Count 6 that both Sloat and Serengeti failed "to mitigate damages" by transferring, re-selling, and removing the coffee from Sloat's warehouse after receiving copies of the January 14, 2012 and January 18, 2012 court orders, which forbade transfer or removal of the coffee.  (SAC ¶¶ 20, 21, 56-61).

Sloat and Serengeti both contend that this Count must be dismissed because failure to mitigate damages is an affirmative defense, not a cause of action.  (*See* Sloat Mov. Br. at 21-22; Ser. Mov. Br. at 15).

Plaintiffs respond by arguing that Count 6 "is a tort claim . . . for its failure to avoid further injury." (Pl. Sloat Opp. Br. at 26; Pl. Ser. Opp. Br. at 20). Plaintiffs say that "[i]t is axiomatic . . . under New Jersey law [and the Uniform Commercial Code] that Serengeti [and Sloat each] had a duty to avoid further injury once [they] learned that Calis never had authority to transfer the [coffee] to Serengeti." (Pl. Sloat Opp. Br. at 26; Pl. Ser. Opp. Br. at 20). Plaintiffs maintain that whether Serengeti and Sloat took appropriate steps to avoid further injury is a question for a jury, requiring denial of Serengeti's and Sloat's respective motions to dismiss this Count. (Pl. Sloat Opp. Br. at 26; Pl. Ser. Opp. Br. at 20).

Plaintiffs cite no authority in support of their position that Count 6 should not be dismissed. Indeed, not a single case is provided to this Court that establishes the elements for Plaintiffs' so-called "failure to mitigate damages" cause of action. Surely, if it were "axiomatic" that Serengeti and Sloat had a duty to mitigate damages, at least one decision would have recognized this cause of action. But Plaintiffs do not identify any case, and this Court's own independent research has revealed no case—let alone any New Jersey case—in which failure to mitigate damages was referred to as anything but an affirmative defense. *See, e.g.*, *Prusky v. ReliaStar Life Ins. Co.*, 532 F.3d 252, 258 (3d Cir. 2008) ("Mitigation is an affirmative defense, for which the breaching party bears the burden of proof." (citation omitted)); *State ex rel. Comm'r of Transp. v. Weiswasser*, 693 A.2d 864, 868-69 (1997) ("Mitigation of damages is defined as a reduction of the amount of damages . . . based on facts which show that the plaintiff's conceded cause of action does not entitle him to so large an amount as the showing on his side would otherwise justify." (alteration in original; citation and internal quotation marks omitted)).

Contrary to Plaintiffs' arguments, "failure to mitigate damages" is not a cause of action. Accordingly, Plaintiffs' Count 6 is dismissed *with prejudice*.

24

5.   <u>Unjust Enrichment by Serengeti (Count 8) & the Guthrie Defendants (Count 11)</u>

Counts 8 and 11 of the SAC allege causes of action for unjust enrichment against Serengeti and the Guthrie Defendants, respectively.[16]

Under New Jersey law, "[t]o establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 526 (N.J. 1994) (citations omitted).  Additionally, "[t]he unjust enrichment doctrine requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights."  *Id.* (citations omitted); *see also Stewart v. Beam Glob. Spirits & Wine, Inc.*, 877 F. Supp. 2d 192, 196 (D.N.J. 2012) ("The New Jersey Supreme Court has previously explained that unjust enrichment is a form of quasi-contractual liability, and that 'quasi-contract cases involve either some direct relationship between the parties or a mistake on the part of the person conferring the benefit.'" (citation omitted)).

Both Count 8 against Serengeti and Count 11 against the Guthrie Defendants fail to state a claim for unjust enrichment.  Count 8 alleges that "Serengeti knew, in December 2011, that the fair market value of the [coffee] was approximately $2.8 [m]illion," and that "Serengeti accepted Calis'[s] proposal to 'sell' the [coffee] . . . for approximately $1.423 [m]illion, knowing that

---

[16]    Serengeti moves to dismiss Count 8 for unjust enrichment and Count 9 for negligence on the ground that those claims are barred because Serengeti was an "innocent buyer" under the Uniform Commercial Code ("UCC"). (Ser. Mov. Br. at 16-18).  Without remarking on the merits of whether Serengeti was, in fact, a "buyer in the ordinary course of business" under the UCC, the Court must deny Serengeti's motion to dismiss Count 8 and Count 9 on this ground.  No authority cited by Serengeti supports the proposition that UCC section 2-403, as codified in N.J.S.A. 12A:2-403, insulates Serengeti from all tort claims that may be asserted against it.  While Serengeti is correct that the "purpose of Section 2-403 is to protect the purchasers in the ordinary course of business," *Barco Auto Leasing Corp. v. Holt*, 548 A.2d 1161, 1165 (N.J. Super. Ct. App. Div. 1988), the Court is not persuaded that such protection applies as a matter of law to prevent any scenario in which a buyer in the ordinary course of business may be subject to suit.  Indeed, the Court's independent research has revealed no case or principle of law that offers this sort of blanket immunity for tort claims to a buyer in the ordinary course of business.  Absent further authority to support this point of Serengeti's motion, it must be denied.  But Serengeti will be permitted to raise this argument in any motion to dismiss any amended complaint filed by Plaintiffs.

[Calis's quoted price] was a sweetheart insider-deal price at approximately a 50% discount from the . . . actual fair market value." (SAC ¶¶ 70, 71). Accordingly, allege Plaintiffs, "Serengeti was . . . unjustly enriched in the amount of approximately $1.377 [m]illion . . . at the expense of . . . Plaintiffs." (*Id.* ¶¶ 72, 73).

Count 11 of the SAC alleges that the Guthrie Defendants' commission of roughly $38,000 for the sale of the coffee was "unusually high"; Plaintiffs allege that "the going rate of [a] [c]omission on such a transaction was in the range of approximately $10,000." (*Id.* ¶ 96). The reason for that "unusually high" commission, Plaintiffs allege, was "as a payment for [the Guthrie Defendants'] role in facilitating the wrongful transaction." (*Id.*). Plaintiffs allege that the Guthrie Defendants were therefore unjustly enriched "in the amount of approximately $28,000 . . . at the expense of . . . Plaintiffs." (*Id.* ¶¶ 97, 98).

The SAC does not allege that Plaintiffs conferred any benefit upon Serengeti or the Guthrie Defendants for which Plaintiffs expected remuneration. *See VRG Corp.*, 641 A.2d at 526. Additionally, Plaintiffs do not allege that they had a direct relationship with Serengeti or the Guthrie Defendants, or that they made a mistake in conferring a benefit on those Defendants. *See Stewart*, 877 F. Supp. 2d at 196. Indeed, the SAC does not allege that Plaintiffs are affiliated in any way with ECBV or that Plaintiffs had any involvement with the sale of the coffee to Serengeti.[17]

Accordingly, Plaintiffs have failed to allege facts sufficient to make plausible their claims for unjust enrichment against Serengeti and the Guthrie Defendants. Therefore, Plaintiffs' Count 8 and Count 11 are dismissed *without prejudice*, and Plaintiffs may amend their complaint. As

---

[17]      To be sure, Plaintiffs do allege that they "had an individual ownership interest in the [coffee]" because of their status as counterclaimants and intervenors in the 2010 litigation," (SAC at ¶¶ 13, 14), but Plaintiffs' failure to allege a relationship with ECBV or a connection to the sale of the coffee dooms Plaintiffs' unjust enrichment claims.

with the other Counts already discussed, however, Plaintiffs are advised that they should only amend Count 8 and Count 11 to the extent they believe they can state a plausible claim for relief. A future dismissal of these Counts will be *with prejudice*.

   6.   **Negligence by Serengeti (Count 9) & the Guthrie Defendants (Count 12)**

Count 9 and Count 12 of the SAC allege causes of action for negligence against Serengeti and the Guthrie Defendants, respectively.

To state a claim for negligence, a plaintiff must allege "(1) that the defendant owed a duty of care; (2) that the defendant breached that duty; (3) actual and proximate causation; and (4) damages." *Fernandes v. DAR Dev. Corp.*, 119 A.3d 878, 885-86 (N.J. 2015).

"To recover under a negligence theory, it is paramount that a defendant first owe the plaintiff a duty." *Kernan v. One Washington Park Urban Renewal Assocs.*, 713 A.2d 411, 415 (N.J. 1998) (citations omitted). Indeed, "'[t]here can be no actionable negligence if [the] defendant or the act violated no duty to the injured plaintiff.'" *Tutanji v. Bank of Am.*, No. 12-887, 2012 WL 1964507, at *7 (D.N.J. May 31, 2012) (quoting *Ryans v. Lowell*, 484 A.2d 1253, 1258 (N.J. Super. Ct. App. Div. 1984)).

"The question of whether a duty exists is a matter of law properly decided by the court, not the jury." *Kernan*, 713 A.2d at 415 (citation and internal quotation marks omitted); *see also Tutanji*, 2012 WL 1964507, at *7 ("'The question of the existence of a duty is one of law and not one of fact.'" (quoting *Ryans*, 484 A.2d at 1258)).

In determining the existence of a duty of care, a court properly identifies, weighs, and balances "'several factors—the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution.'"

*Bonnieview Homeowners Ass'n v. Woodmont Builders, L.L.C.*, 655 F. Supp. 2d 473, 512 (D.N.J. 2009) (quoting *Kernan*, 713 A.2d at 415).

The relationship between the parties is itself a critical factor. *See NCP Litig. Trust v. KPMG LLP*, 901 A.2d 871, 888 (N.J. 2006) ("Ultimately, the duty owed to another is defined by the relationship between the parties."); *see also Magnum LTL, Inc. v. CIT Grp./Bus. Credit, Inc.*, No. 08-5345, 2009 WL 1025550, at *4 (D.N.J. Apr. 16, 2009) ("Based on the Complaint, no relationship between [the plaintiff] and [the defendant] exists.  Lacking such a relationship, [the plaintiff] cannot establish a duty of care, a breach of that duty, or any other of the . . . necessary elements for a negligence claim.").  Similarly, the foreseeability of injury to a potential plaintiff does not alone establish the existence of a duty, "but it is a crucial element in determining whether imposition of a duty on an alleged tortfeasor is appropriate." *Fernandes*, 119 A.3d at 886 (citation and internal quotation marks omitted).

Here, applying those factors, the Court concludes that Plaintiffs' negligence claims under Counts 9 and 12 must be dismissed.[18]

### i. *Count 9 - Serengeti*

Count 9 of the SAC alleges that Serengeti failed to discharge its duty of care in several respects.  (*See* SAC ¶¶ 80, 81).  They allege Serengeti:

> [F]ailed to verify ownership of the [coffee] . . . ;
>
> [F]ailed to verify that the party . . . selling the [coffee] actually was the owner, or had authority to sell the [coffee];

---

[18]     Plaintiffs' opposition briefing is entirely silent in response to Serengeti's and the Guthrie Defendants' arguments for dismissing Counts 9 and 12.  (*See generally* Pl. Ser. Opp. Br. at 22-24; Pl. Guthrie Opp. Br. at 1-5).  The Court dismisses Plaintiffs' Counts 9 and 12 for the additional reason that they fail to address Serengeti's and the Guthrie Defendants' respective arguments for dismissal.  Indeed, "[w]here an issue of fact or law is raised in an opening brief, but it is uncontested in the opposition brief, the issue is considered waived or abandoned by the non-movant." *Lawlor v. ESPN Scouts, LLC*, No. 10-5886, 2011 WL 675215, at *2 (D.N.J. Feb. 16, 2011) (citing *Conroy v. Leone*, 316 F. App'x 140, 144 n.5 (3d Cir. 2009) ("We find this undeveloped argument has been waived.")).

[F]ailed to verify the validity of seller[']s documents, including contract, Delivery Order, Sampling Orders, Weight Certificates, and original shipping documents;

[F]ailed to verify that there were no pending liens or other legal restriction[s] placed on the coffee;

[F]ailed to verify that Calis actually had the authority to consent to and authorize the sale [despite Serengeti being] aware of the highly unusual nature of the transaction, and . . . of the long-running legal dispute over the ownership of the [coffee];

[A]dopted a "see no evil, hear no evil" approach and failed to take care to verify that the proposed purported "sale" of the goods was not part of a scheme to defraud, or a scheme to launder funds, or a scheme to engage in criminal activity;

[F]ailed to verify that the individual signing the delivery order had the authority to do so; [and]

[F]ailed to verify that the [coffee] could be validly transferred to a third party buyer by obtaining the proper legal documents releasing the [coffee] from any and all liens and/or other court restrictions.

(*See* SAC ¶ 80(a)-(h)).

Considering the factors relevant to the existence of a duty under New Jersey law, *see Bonnieview Homeowners Ass'n*, 655 F. Supp. 2d at 512 (noting factors), the Court finds that the SAC does not allege a duty of care flowing from Serengeti to Plaintiffs. First, no allegations suggest any relationship between Serengeti and Plaintiffs. *See id.* (noting one factor to be considered is "the relationship of the parties"). Plaintiffs allege, *inter alia*, that Serengeti had "notice" of the disputed ownership of the coffee, (*see* SAC ¶¶ 58, 76), that Serengeti was informed by the Guthrie Defendants that the ownership of the coffee was in dispute, (*id.* ¶ 77), and that Serengeti received the November 2011 Order, (*id.* ¶ 78). But none of those allegations speak to any relationship between Serengeti and Plaintiffs. Instead, the SAC alleges facts throughout suggesting that Serengeti had a relationship with Calis, the Guthrie Defendants, and possibly even Sloat, (*see, e.g.*, *id.* ¶¶ 49, 71, 77, 85), but never Plaintiffs.

29

Second, in light of Serengeti possessing the November 2011 Order, (*id.* ¶ 78), Serengeti had no reason to foresee any risk of harm flowing to Plaintiffs from purchasing the coffee or, more specifically, wiring funds to Calis's personal bank account.  *See Bonnieview Homeowners Ass'n*, 655 F. Supp. 2d at 512 (noting one factor to be considered is "the nature of the attendant risk"). As already discussed, the Order vested Calis with the authority to market and sell the coffee, and required that the net proceeds of any sale be deposited in the Trust Account.  (11/7/11 Order ¶¶ 2, 3, 4, 6).  The fact that the net proceeds—as opposed to all sale proceeds—were to be deposited in the Trust Account suggests that all sale proceeds had to be sent to some other bank account first. Indeed, if all sale proceeds were deposited in the Trust Account, there would have been no way for Calis to deduct payments for storage and the marketing and sale of the coffee, as the Order required, (*id.* ¶¶ 4, 6); the funds would not be reachable, they would be in escrow.  So, in order for Calis to fulfill his court-ordered obligation to pay for "all expenses relating to the sale of the [c]offee, including storage costs and direct costs of sale," (*id.* ¶ 4), he had to have control of the sale proceeds first.  All of this is plain in the November 2011 Order's language.  Accordingly, Serengeti would have no reason to foresee that sending the sale proceeds to Calis would cause any risk to anyone, let alone Plaintiffs.  Rather, the November 2011 Order—besides placing no express and independent duty on the buyer of the coffee to send any funds to any particular place—merely provided that the net proceeds were to be deposited in the Trust Account.  Therefore, the notion that Serengeti should have foreseen that their payment to Calis would result in the alleged harm to Plaintiffs is not only unsupported by any allegations in the SAC, but is contradicted by the Order, logic, and common sense.

Third, the Court finds that, under the allegations of the SAC and in consideration of the November 2011 Order, Serengeti exercised care.  *See Bonnieview Homeowners Ass'n*, 655 F.

Supp. 2d at 512 (noting one factor to be considered is "the opportunity and ability to exercise care").  Serengeti wired funds and purchased the coffee in a manner consistent with the terms of the November 2011 Order.

While Serengeti theoretically might have had the opportunity to exercise *more* care than it already exercised, the Court finds the notion that Serengeti should have gone beyond what a court order required and exercised a "duty to verify" unsupported in law and against the public interest. *See id.* (noting last factor to be considered is "the public interest in the proposed solution"). Plaintiffs' proposal would foist upon a buyer of goods a "duty to verify" for itself that the transaction was appropriate in all respects, despite that buyer being in possession of a court order requiring the transaction to be effected and specifying the transaction's terms.  The Court finds such a proposal unreasonable and unworkable.  A buyer of goods who acts pursuant to the clear directives of a court order should not have the burden of some obligation to ensure that all aspects of the transaction are in order, especially when, as in this case, the court order places no obligation whatsoever on that buyer.

Accordingly, the Court finds that Plaintiffs have failed to allege a cognizable duty of care as to Serengeti in Count 9.

### ii. *Count 12 – The Guthrie Defendants*

In Count 12, Plaintiffs allege that the Guthrie Defendants breached the same duties alleged as to Serengeti.  (*See* SAC ¶¶ 80, 81, 103, 104).  Additionally, Plaintiffs allege that the Guthrie Defendants:

> [F]ailed to verify that the invoice and Delivery Order were valid legal documents, accepted by the warehouse which actually transferred the coffee into Guthrie's name as buyer; [and]

> [Were] aware that Calis had asked that the $1.423 [m]illion in net proceeds be wired
> to the Dutch Rabobank account of an entity which did not, and had never at any
> time, had ownership of the [coffee].

(*Id.* ¶ 103(i)-(j)).

Again considering the applicable factors for determining the existence of a duty, *see Bonnieview Homeowners Ass'n*, 655 F. Supp. 2d at 512, the Court finds that the SAC does not allege a duty of care on the part of the Guthrie Defendants.  First, Plaintiffs do not allege a relationship that would give rise to a duty owed them by the Guthrie Defendants.  *See id.* (noting a factor to be considered is "the relationship of the parties").  Plaintiffs allege that George Guthrie "had previously worked for many years as a colleague of Plaintiff George H. Willekes, and was employed by a company, European Coffee, Inc. N.J. . . . , of which George H. Willekes was President."  (SAC ¶ 86).  That employment relationship provided George Guthrie with "direct personal knowledge that the legal ownership of the [coffee] was very much in legal dispute, dating back to 2010 or earlier."  (*Id.* ¶ 87).  But that previous employment relationship is insufficient to establish a duty of care running from the Guthrie Defendants to Plaintiffs in the transaction at issue.  Indeed, the SAC alleges that the Guthrie Defendants "served as a broker or sales representative in the transactions in controversy, by which the [coffee was] wrongfully released by . . . Sloat, [was] wrongfully transferred to . . . Serengeti, and by which $1.423 [m]illion in sales proceeds were illegally wired to a secret overseas bank account controlled by . . . Calis rather than to the . . . Trust Account . . . , nor even to an account in the name of the titled owner of the coffee."  (*Id.* ¶ 85).  The Guthrie Defendants' involvement in the transaction, as alleged in the SAC, has nothing to do with Plaintiffs.  George Guthrie's prior employment relationship with George H. Willekes does not change the absence of any relationship between Plaintiffs and the Guthrie Defendants with regard to the coffee sale.

Second, the SAC is bare of allegations indicating that the Guthrie Defendants should have identified any risk of harm to Plaintiffs that would flow from their actions. *See Bonnieview Homeowners Ass'n*, 655 F. Supp. 2d at 512 (noting one factor to be considered is "the nature of the attendant risk"). To the contrary, the SAC alleges that the Guthrie Defendants "received a copy of the November 7, 2011 Order" on November 10, 2011. (SAC ¶ 102). The unambiguous language of that Order provides Calis with the authority to engage in the sale. (*See* 11/7/11 Order ¶¶ 2, 3, 4, 6). Plaintiffs allege that the Guthrie Defendants were "aware of the highly unusual nature of the transaction," (SAC ¶ 103(e)), but the notion that the transaction was "highly unusual" is unsupported and, in any event, immaterial because the November 2011 Order directed that the coffee be sold as soon as possible, (11/7/11 Order ¶ 2). The Court finds it unreasonable to expect the Guthrie Defendants to have foreseen that its brokering of a sale pursuant to a court order would ultimately result in the authorized seller's agent absconding with the net proceeds of the sale.

Third, the Court finds that, under the allegations of the SAC and in consideration of the November 2011 Order, the Guthrie Defendants exercised care. *See Bonnieview Homeowners Ass'n*, 655 F. Supp. 2d at 512 (noting a factor to be considered is "the opportunity and ability to exercise care"). They brokered a sale in a manner consistent with a court order that they possessed.

The Guthrie Defendants might have had the opportunity to exercise more care than it already exercised. That is, the Guthrie Defendants *could have*, after receiving the November 2011 Order requiring that Calis sell the coffee, gone further and "verified" that, for example, "there were no pending liens or other legal restriction[s] placed on the coffee" and that "Calis actually had the authority to consent to and authorize the sale." (SAC ¶ 103). But, for the same reasons as with Serengeti, the Court finds that a proposal requiring the Guthrie Defendants to go beyond the requirements of a court order and essentially conduct its own investigation is without a basis in the

law and against the public interest.  *See Bonnieview Homeowners Ass'n*, 655 F. Supp. 2d at 512 (noting the last factor to be considered is "the public interest in the proposed solution").

Accordingly, the Court finds that Plaintiffs have failed to allege a cognizable duty of care as to the Guthrie Defendants in Count 12.

### iii.  *Leave to Amend*

As with many of the previously discussed Counts of the SAC, Plaintiffs' Counts 9 and 12 appear to rely heavily on Plaintiffs' mistaken interpretation of the November 2011 Order.  To the extent Plaintiffs seek to hold Serengeti and the Guthrie Defendants liable for the breach of a duty of care allegedly imposed by the November 2011 Order, Counts 9 and 12 are dismissed *with prejudice*.  But the Court will permit Plaintiffs to amend these Counts for negligence to the extent Plaintiffs can allege a cognizable duty of care owed by Serengeti and the Guthrie Defendants that was created by some other relationship.  Indeed, on this record and at this stage of the litigation, the Court cannot say that, as a matter of law, Plaintiffs can never state a claim for negligence against Serengeti and the Guthrie Defendants.[19]

## V.  CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss are GRANTED in part and DENIED in part.  Specifically, Defendants' Motions for dismissal on standing grounds are denied, but Defendants may bring such an attack at the appropriate stage of the litigation, as discussed *supra*.  Serengeti's and Sloat's entire controversy ground for dismissal is denied *with prejudice*.

---

[19]    To be sure, the Court recognizes Serengeti's and the Guthrie Defendants' arguments that their conduct could never have been the proximate cause of Plaintiffs' alleged damages, as Calis's conduct was the proximate cause of those damages.  (*See* Ser. Mov. Br. at 20-21; Guthrie Mov. Br. at 13-15).  But on this record, the Court cannot say that as a matter of law.  Plaintiffs may, in an amended complaint, allege a cognizable duty of care, the breach of which may be a cognizable proximate cause of Plaintiffs' alleged harm.  The Court presently does not possess all the facts necessary to make such a ruling, which may be more appropriate for summary judgment.  The Court will permit, however, Defendants to argue lack of proximate cause in any motion to dismiss any amended complaint filed by Plaintiffs.

Sloat's argument under Count 4—that it had no obligation as a bailee to verify that payment was made to a particular place before releasing the coffee—is denied *without prejudice* to Sloat's ability to raise that argument in any future motion to dismiss.  Also denied *without prejudice* is Serengeti's motion to dismiss on the ground that it is protected from unjust enrichment and negligence claims as a matter of law as a buyer in the ordinary course of business.  Defendants' Motions are granted in all other respects, and Plaintiffs' claims are dismissed as follows.

Counts 1, 2, 3, 4, 5, 7, 8, 9, 10, 11, and 12 are dismissed *without prejudice*.  But, in an amended complaint, Plaintiffs may not rely on the November 2011 Order to establish a duty of care under Counts 2, 4, 5, 9, or 12.  The SAC's Count 6 is dismissed *with prejudice*.  An appropriate Order accompanies this Opinion.

*s/ Esther Salas*
**Esther Salas, U.S.D.J.**